## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Case No. 23-CR-00056-JEB** |
| | ) | |
| **WILLIAM HENDRY MELLORS,** | ) | |
| | ) | |
| *Defendant* | ) | |

## MELLORS'S REPLY IN SUPPORT OF MOTION TO TRANSFER VENUE

William Mellors, through undersigned counsel, files this reply in response to the Government's Opposition to his motion to transfer venue (ECF No. 51). In its opposition to Mr. Mellors's motion, the government attacks Mr. Mellors's arguments on each of the factors set out in *United States v. Skilling*, 561 U.S. 358, 381 (2010), but fails to address the cumulative effect of the issues with the DC jury pool. The survey data cited by Mellors, the pretrial publicity, and the overwhelming guilty verdicts in DC to date, require a transfer of venue to safeguard Mr. Mellors's right to a fair trial by an impartial jury.

### I.     The Select Litigation survey results are strong evidence supporting a change of venue.

The survey results that Mr. Mellors submitted to the Court show that 61% of respondents said that they had formed the opinion that January 6 defendants were "guilty" of the charges against them and show many other signs of having prejudged all of these cases indiscriminately. Mellors Mtn to Transfer Venue, ECF No. 38, Ex. 1. A majority of prospective jurors (70%) still hold unfavorable opinions of the "people arrested for participating in the events at the Capitol on January 6." ECF No. 38, Ex. 1 ¶ 8. Survey respondents admit that they have strong underlying impressions—prejudgments—about the defendants' associations, beliefs, actions, and

1

motivations. ECF No. 38, Ex. 1 ¶ 14. Large majorities of DC residents surveyed readily accept negative descriptions of individuals charged in connection with January 6th; a majority believes that most defendants are accurately described as "conspiracy theorists," "white supremacists," and "criminals." ECF No. 38, Ex. 1 ¶ 14.

The government attempts to undermine these results by suggesting that courts have determined that no survey has value in the evaluation of whether a transfer of venue is appropriate in a given case, and by attempting to critique this specific survey. Neither effort is successful.

### A. The government fails to establish that survey data cannot support a transfer of venue.

The government wrongly suggests that survey results cannot support a finding of presumed prejudice, citing select cases in which courts have declined to rely on surveys for that purpose. ECF No. 51 at 17. Each of these cases is distinguishable.

First, in all of the cases the government cites, survey respondents were asked entirely different questions than were asked here. Second, in many of these cases, survey respondents were not even asked to opine on the "guilt" of the defendants at issue. *See, e.g., United States v. Campa*, 459 F.3d 1121 (2006) (reflecting that respondents in survey submitted in support of transfer motion by five men accused in Miami district of acting as unregistered Cuban intelligence agents were not asked to opine on anyone's guilt); *United States v. Causey, et al.*, Case No. H-04-205, 2005 WL 8160703 (S.D. Tx. Jan. 1, 2005) (noting that in the *Skilling* case, respondents were asked to name all executives they believed were guilty of Enron crimes, which took for granted that the respondent must believe some were, and noting that 87.7% of respondents did *not* name Skilling in response).

Third, in the other cases the government relies on, the court that rejected survey evidence as grounds to transfer venue did so only after discrediting many of the techniques employed by

the survey-givers at issue. This was the case in *Campa*, in which the district and circuit courts rejected survey data submitted by the defendants and relied on many critiques of the survey techniques employed by the pollster, including criticisms that the government offered through its own expert. *Campa*, 459 F.3d at 1130–31, 1145–46 (describing several critiques offered by the government and the district court, and adopting many of them). As discussed further below, the government cannot level the same criticism of the methods here.

Finally, in the one case cited by the government in which the reviewing court rejected survey results as useful evidence in a venue analysis more generally, the majority betrayed a generalized bias against surveys that the government does not assert here, and which may have been a function of the era. *United States v. Haldeman*, 559 F.3d 31, 64 n. 43 (1979) (characterizing *all* polls as "suspect" and noting that the district court did not have to consider pollster "paid for by one side" as an expert without offering specific critique of the defenses's retained pollster).

As discussed below, the government's critique of Select Litigation's survey fails to establish that the Court should disregard the defense's survey evidence that Mr. Mellors will not be able to find an impartial jury at his trial in November.

**B.  The critique that the defense's survey did not include an option to answer "don't know" fails to undermine results.**

The government's only critique of the instant survey's mechanics is that Select Litigation did not provide survey respondents with an instruction that they could say they were "unsure" about the guilt of the January 6 defendants (or about other issues explored in the survey). ECF No. 51 at 21. The government asserts that such an option is "required" by standards issued by a professional organization, the American Society of Trial Lawyers (ASTL). *Id.* This attempt to undermine Select Litigation's methods fails.

First, there is good reason for Select Litigation's choice not to include a "don't know" prompt in its survey. This is established in a research and literature summary published in 2010, four years after the most recent study cited by the ASTL standards. This peer-reviewed article notes that although there is evidence that offering "don't know" answers may "encourage people without information to admit it," such questions "may go too far and discourage people who do have information with which to generate a meaningful answer from expressing it."[1] "In fact, there is considerable evidence that these questions do not improve measurement." *Id.* After reviewing studies of this issue, the authors of this research summary conclude that "data quality does *not* improve when" the option to answer "don't know" "is explicitly included in questions." *Id.* at 285 (emphasis added).

Second, the government implies that the ASTL standards provide that there must be an "unsure" option given with each question. ECF No. 51 at 21. In fact, the standards only require that respondents be "made aware that they can say they do not know or have no opinion." ASTL Standards at 9. Select Litigation's results show that respondents *were* aware of that here. As the government notes, about 33% of respondents did answer with some variation of "I don't know," or "it depends," or refused to answer altogether. *See* ECF No. 38, Ex.1, App. A. This is evidence that a specific cue is not necessary to identify those who do not hold a strong concrete opinion on a particular issue examined in a survey.

## II.   The government fails to refute the ways in which the survey shows that *voir dire* will be inadequate in this case.

The government argues that the fact that 61% of DC residents believe those arrested in the wake of January 6 are guilty does not support presuming prejudice. According to the

---

[1] Jon A. Krosnick & Stanley Presser, *Question and Questionnaire Design*, in HANDBOOK OF SURVEY RESEARCH (2d. ed. 2010, Peter V. Marsden & James D. Wright, eds.) at 263, 282.

government, the fact that "only" 46% say that they are "more likely to vote that the person is guilty" if they were on a jury (the Q5 results) arises from these jurors' discerning a meaningful difference between those "merely arrested," and those "charged." ECF No. 51 at 22. And the government argues that because the percentage has gone down (from 71% to 61%) since the last time the poll was conducted, the court should be assured that "more than a quarter of the District's residents realized the need to keep an open mind about guilt." ECF No. 51 at 21.

This is not comforting. Findings from the Select Litigation study highlight the hollowness of the presumption of innocence in DC in January 6th trials:

> Th[e] perception of guilt goes beyond a simple, loosely held opinion. From early in life, most every American is exposed to the monition that, if they serve as jurors, they must treat defendants as "innocent until proven guilty." Despite this, **a plurality of jury-eligible residents of the District of Columbia—46%—admits that if they were "on a jury for a defendant charged with crimes for his or her activities on January 6th, they would be more likely to vote the defendant "guilty."**

ECF No. 38, Ex 1. ¶ 10.

Notably, 76% of survey respondents who said they believe January 6 defendants will receive a fair trial also admitted that they think January 6th defendants are guilty. These two positions simply do not align. And, further, 56% of these respondents admitted *they would vote guilty* if they were on a jury. ECF No. 38, Ex 1 ¶ 11.

Additionally, a new question was asked in the most recent Select Litigation poll that was not asked previously: With regard to the cases for individuals charged with crimes for his activities on January 6th, *do you want the juries hearing those cases to find the defendants guilty or not guilty of the charges against them?* 39% of respondents admit to wanting January 6th defendants found guilty. 50% said it depends. And only 5% say not guilty. ECF No. 38, Ex. 1, App. A (Q7). The fact that the government claims that these answers are justified because the answers "likely reflect

the commonly held view that most people arrested for crimes are in fact guilty of those crimes," ECF No. 51 at 23, is shocking in its open disregard for the presumption of innocence.

The polling results give clear reason to believe that (1) the bias against January 6th defendants by DC residents is strong and deeply felt and (2) many potential jurors are reluctant to admit their bias, consistent with research showing that people are prone to give socially acceptable answers. The risk that jurors will not reveal their true biases in *voir dire*—coupled with the many obvious grounds for DC residents to harbor biases that jurors in other venues would not—weighs in favor of transferring this case to another venue to ensure that Mr. Mellors's right to an impartial jury is protected.

To be clear, the defense's concern about the DC jury pool does not rest on the assumption that potential jurors would deliberately mislead the Court in *voir dire.* The concern is that true partiality may not be discernable to the Court, or even to jurors themselves, given what we know about how people respond to social cues, and given Select Litigation's results in this case. *See Irvin v. Dowd*, 366 U.S. 717, 728 (1961) ("No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but psychological impact requiring such a declaration before one's fellows is of its father. Where so many, so many times, admitted prejudice, such a statement of impartiality can be given little weight.").

In short, the Court should credit and consider Select Litigation's results showing what potential DC jurors said about bias when they didn't know what the "socially right answer" was as powerful evidence of deep prejudice in the DC juror pool, and not join the government in assuming without evidence that *voir dire* will root out partial jurors.

### III.    The government ignores the *cumulative* effect of the issues with the DC jury pool.

Just as the government picks at individual findings of the survey, it argues that media coverage of January 6 does not by itself establish that the Court should presume prejudice. Mr. Mellors never said that it did, though he did offer evidence and argument that the coverage of January 6 has been of a type and volume capable of inducing unusual levels of pretrial prejudice. To the contrary, Mr. Mellors has emphasized that multiple unusual factors combine to justify transfer here. The government has yet to squarely address this central argument.

For example, the government references the passage of time and offers that "as more January 6 defendants go to trial, the level of media attention given to each particular trial is likely to diminish." ECF No. 51 at 28. This argument ignores the near constant headlines related to January 6th that inundate DC's local news and, in particular, the Washington Post, which is the District's local paper. The Post covers January 6 constantly, including those cases that are not widely followed in the national news, bond hearings, indictments, plea hearings, and trials. The Post's coverage has been so extensive that it won the 2022 Pulitzer Prize public service medal "for its coverage of the causes, costs and aftermath of the Jan. 6 attack, showing how the forces behind the siege are shaking the underpinnings of democracy."[2] The impact of the local paper's coverage of these cases has particularly significant impact in DC, where residents are especially news aware.

The government makes zero attempt to address the surge in media reports and focus on DC following the recent federal indictment of former President Trump that, if anything, points to an uptick in media attention on the events of January 6th.

---

[2] Washington Post Staff, "Read The Washington Post's 2022 Pulitzer Prize-winning work for public service," May 9, 2022, *available at* https://www.washingtonpost.com/pr/2022/05/09/pulitzer-prize-public-service/

This case is not exactly like *Rideau v. Louisiana*, 373 U.S. 723, 724 (1963), and it is not exactly like any other case in which federal courts have granted a transfer. But it is also *unlike* many of the cases not transferred. For example, this case is *unlike* the many such cases in which potential jurors had no reason to identify as victims, such as *United States v. Haldeman*, 559 F.2d 31, 64, 52 (1976). And it is also *unlike* the many such cases in which trial was to be held in a large federal district, like in *United States v. Skilling*, 561 U.S. 358, 382 (2010) (noting that Houston was the fourth most populous city in the nation). And it is also *unlike* cases in which the presiding judge was not presented with credible data demonstrating that potential jurors in the venue harbored extraordinary levels of bias against the defendant, such as in *Campa*, 459 F.3d at 1130–31, 1145–46. Indeed, as to every one of these factors, the contrary is true.[3] Like

---

[3] While the cases cited by the government did not result in transfer of venue, the trial courts took significant measures to assure a fair trial. For example, in *United States v. Rodriguez*, 581 F.3d 775, 785 (8th Cir. 2009), cited by the government's opposition at 18, the trial court:

> … moved the trial from Grand Forks to Fargo, 80 miles away, and excluded Grand Forks-area residents from the venire. The court assembled a 590–person jury pool, twelve times the normal size, and required jurors to answer a 121–question form, including detailed questions on their knowledge and beliefs about the case. Rodriguez received ten additional peremptory strikes, for 30 total. The court spent 21 days conducting voir dire.

In *Haldeman,* 559 F.2d at 65–66, during voir dire,

> "the court focused on the venireman's exposure to pretrial publicity and possible biases. Before the publicity was mentioned the venireman was asked if he believed that any defendant was probably guilty. He was then asked if he had heard of the case and, if so, whether anything he had heard or read about the case stood out in his mind. The next questions asked whether the venireman had seen the defendants or their lawyers in the newspapers or on television and whether he remembered anything in particular about them. Subsequently the court determined which newspapers and magazines the venireman read and with what degree of regularity; which television news programs he watched; whether he had followed the legislative inquiries related to Watergate or read any of the books or other lengthy pieces concerning Watergate, including the presidential tape transcripts; whether he had followed Watergate closely or casually; and whether (and how recently) he had discussed the case.

> After determining the venireman's degree of interest in and exposure to the case, the

*Rideau*, this case is unusual.

## IV.    Conclusion

Mr. Mellors's request for transfer does not arise from a desire to be tried in a particular district, but rather from a desire to not face trial in this uniquely partial district. The Court should transfer the case pursuant to either the Constitution or Rule 21 because of the cumulative impact of the many factors set out here and in Mellors's Motion to Transfer Venue (ECF No. 38). For all these reasons, Mr. Mellors requests that the Court grant his motion and transfer venue out of Washington DC.

Respectfully submitted,

MAUREEN SCOTT FRANCO
Federal Public Defender

_____/s/_____
CHARLOTTE A. HERRING
Assistant Federal Public Defender
Western District of Texas
504 Lavaca St., Ste. 960
Austin, Texas 78701
(512) 916-5025

---

court inquired whether he had formed or expressed an opinion of the guilt or innocence of any defendant. In addition, the judge determined whether the venireman knew of Ehrlichman's trial and conviction in the "plumbers" case, whether he knew of the pardon of former President Nixon, whether he thought it unfair to prosecute appellants in light of the pardon, whether the pardon caused the venireman to believe appellants were guilty or innocent, and whether the fact that Nixon had been named an unindicted co-conspirator affected the venireman's view of appellants. If the venireman had formed an opinion, the judge attempted to determine whether that opinion was firmly held or could be set aside. In closing he was asked whether he could return a fair and impartial verdict based solely on the evidence presented at trial and the court's instructions on the law. After the basic questioning was completed, the venireman was excused while the court considered counsel's objections and suggestions for additional inquiries. This step often resulted in recall of the venireman for more questioning.

_____/s/_____
JESÚS M. SALINAS, JR.
Assistant Federal Public Defender
Western District of Texas
504 Lavaca St. Suite 960
Austin, Texas 78701
(512) 916-5025

## CERTIFICATE OF SERVICE

I, Charlotte Anne Herring, Assistant Federal Public Defender for the Western District of Texas, hereby certify that on the 6th day of October 2023, I electronically filed the foregoing pleading with the Clerk of Court using the CM/ECF system, which will send electronic notification of such filing to all counsel of record.

_____
/s/  CHARLOTTE ANNE HERRING